UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 21-cr-381-TSC |
| v. : | |
| : | |
| STACY WADE HAGER, : | |
| : | |
| Defendant : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Stacy Wade Hager, to 12 months of incarceration, and $500 in restitution.

I.   **Introduction**

Defendant Hager, a 59-year-old retiree, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.

Hager was convicted of four misdemeanor counts following a bench trial. The Court found Hager guilty of Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 12 months

is appropriate in this case because Hager: (1) anticipated violence on January 6, and packed his bags as to prepare for hand-to-hand fighting; (2) came to Washington, D.C. fixated on the idea that only his preferred presidential candidate, Donald Trump, could take office; (3) was in a position to observe the violence on January 6, and yet taunted police as he made his way deeper into the Capitol to disrupt the Congressional proceedings; (4) continues to espouse conspiracy theories that January 6 was a hoax and that police invited rioters into the Capitol—despite what he saw firsthand; and (5) has expressed no remorse for his actions on January 6, and instead romanticizes the violent actions of the rioters.

The Court must consider that Hager's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances proved at trial not only showed Hager's knowledge of the desperate task that police confronted on January 6, 2021, but also that Hager's middle finger, shown at the beginning of his day, continued metaphorically as he entered the clearly restricted area, yelled and cursed at officers, and entered the Capitol with the goal of looking for Congress. Hager's crimes



Figure 1: Trial Exhibit 241

2

support the imposition of a sentence of 12 months incarceration in this case.

## II.     Factual and Procedural Background

Hager travelled to Washington, D.C. from his home in Waco, Texas, with a friend, Jeffrey. In the months and days leading up to January 6, Hager had posted extensively on social media about plans to attend the Trump rally, referring to January 6th as "the big dance." Hager and his friend discussed what to bring, and after some consideration, Hager opted to bring a Texas flag.



Figure 2: Trial Exhibit 240

Hager also posted on Facebook about Pence's upcoming role in the electoral college vote count on January 6 at the U.S. Capitol. In a post, dated December 15, 2020, Hager espoused his theories that the election results were "deception and lies" spread by the media, and argued that "Mike Pence is in full authority [on January 6] as written in the Constitution. The ballots will be certified today but that means nothing."

On January 6, after attending the "Stop the Steal" rally at the Ellipse, Hager and his friend walked to the U.S. Capitol. At 1:55 p.m., Hager recorded a video on his phone at the northeast corner of the Capitol's reflecting pool and stated: "Oh wee! We have arrived." In a contemporaneous recording, Hager stated: "Well, it's gonna be our last one [peaceful protest]!" Hager and his friend separated when Hager travelled past the police lines. Seventeen minutes after these recordings, Hager would record himself moving into the scaffolding amid flashbangs and tear gas, where he then said, "It's goin' down!" Hager moved to a position overlooking the line of police officers trying desperately to hold back other rioters and yelled: "You fuckin'… pieces of shit! You wanna steal our election? We'll fuck…everybody!"



Figure 3: Screengrab from Trial Exhibit 230

Hager continued to chant and cheer the progress made by his fellow rioters. Hager narrated in his recording: "We are all over the place, we could just, we could just come on forward! Come on forward." When a group of Capitol Police officers approached Hager's position in an attempt to remove the group, Hager yelled in their direction: "We could breach REAL EASY. I'll die! I'll

die!" After police unsuccessfully attempted to remove Hager from his elevated position, Hager continued to record the progress made by his fellow rioters.

From Hager's elevated position, he continued to record himself chanting, "U.S.A.!" When a line of police officers approached him at 2:21 p.m., he yelled in their direction, "we can breach this motherfucker in a heartbeat." He continued: "We can breach real ea-fuckin' easy. You wanna fuckin' play it, you wanna play it that way? We'll play it that way!".



Figure 4: Screengrab from Trial Exhibit 234

At 2:29 p.m. Hager once again recorded the scene as the rioters located on the West Plaza below caused the line of police to begin retreating. Hager commented: "The shit has, indeed, hit the fan!"



Figure 5: Screengrab from Trial Exhibit 237

While commenting about the number of individuals breaching the officers' lines, Hager noted: "Obviously, I'm behind the lines here…" Hager then moved to the top of the grandstands overlooking the back of the inaugural stage, where he yelled to officers to "fight another day" and "just be on our side next time!" Again, from his elevated position, Hager could clearly see—as he described—"the cops on one side, and the patriots on the other!" Finally, he yelled, "these guys are in deep doo-doo!" towards a line of officers retreating from the West Plaza.

At 2:34 p.m., Hager entered the Capitol building through the Upper West Terrace Door. During his entry, a loud alarm could be heard from the fire door being held open by rioters. Upon entering, Hager announced that he was "putting [his] money where [his] mouth is." Once inside,

Hager walked past a small number of officers to whom he said, "there's about a million people behind us." He then went up the stairs to the Rotunda and asked, "now, where is Congress?"



Figure 6: Screengrab from Trial Exhibit 238

Hearing some other rioters had been in Nancy Pelosi's office, Hager was prompted to ask where that office was located and then moved in that direction while unfurling his Texas state flag.

Hager then moved from the south end of the Rotunda to the north end. Capitol surveillance captured him moving to the Law Library stairs where he made his way to the first floor of the Capitol. From this staircase, Hager moved to the Memorial Door Corridor, where he attempted to snap a photo of a Thomas Jefferson bust wearing a red hat. An officer nudged Hager to keep moving. Hager then headed towards the south end of the building, but before leaving, he took one more loop away from the South door, down a hallway off the Hall of Columns, and then exited through the South Door at 2:47 p.m.

From the evening of January 6 through and until just days before Hager's trial commenced, Hager posted multiple messages to social media in which he boasted about his conduct on January

6, stating, among other things, that he "took the hill," and that the event was "hands down the most completely patriotic thing I've ever been a part of. . . . All came together and took the hill . . . Today was EPIC!"

A search of Hager's home was conducted on May 25, 2021. The physical exhibits admitted at trial (the flag, pole, and mug) were seized on that day. Hager, while on the telephone with the agent conducting the search, informed the agent that he was let inside the Capitol by a police officer. Later, Hager told the same agent that Hager knew what he did was wrong. However, this is the only instance in which Hager has acknowledged *any* wrongdoing.

*Hager's Social Media Use After His Arrest*

From the date of his arrest until shortly before trial, Hager continually romanticized the January 6 riot and espoused conspiracy theories to his publicly viewable Facebook profile. In a post dated August 17, 2022, Hager commented that he "would die [] so others may get the chance to be at an event like the 6th where patriotism was so thick it was palpable. Patriotism so overwhelming it was truly spiritual." Hager also claimed that January 6 was "the biggest hoax in our nation's history," and blamed police for the riot, stating "No one was going in until the capitol police walked out and started waving people inside.  Just so you know the real story." Purposely ignoring the flashbangs, the tear gas, and the violence against police officers that he personally witnessed and encouraged on January 6, Hager has doubled-down on conspiracy theories and has refused to take responsibility for his actions.

8

From October 31, 2022:



Figure 7: Facebook Post from October 31, 2022

*The Charges*

On May 19, 2021, the United States charged Hager by criminal complaint with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On June 4, 2021, Hager turned himself into the McLennan County jail in Waco, Texas. On February 25, 2022, the United States charged Hager by a four-count superseding information with the same charges found within the complaint. On April 4, 2023, following a two-day bench trial, this Court found Hager guilty of all four counts.

III.   **Statutory Penalties**

Hager now faces sentencing on those four counts. Each violation of 18 U.S.C. § 1752(a) carries a possible one-year imprisonment and a fine of up to $100,000; followed by a potential of

one year of supervised release. Each violation of 40 U.S.C. § 5104(e)(2) carries a maximum possible penalty of six months imprisonment with a fine of up to $5,000.

## The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, this Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id*. at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decision" and are the "starting point and the initial benchmark" for sentencing. *Id*. at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Hager's adjusted offense level under the Sentencing Guidelines as follows:

The U.S. Probation Office appropriately grouped counts one and two. The group offense level is then determined by the most serious of the counts comprising the group. Here, the government agrees that is count two. Finally, the guidelines do not apply to counts three and four. The scoring of count two controls:

**Count Two**

**18 U.S.C. § 1752(a)(2) - Disorderly and Disruptive Conduct in a Restricted Building or Grounds**

Here, the U.S. Probation Office correctly determined the most applicable guideline for this violation. It is §2A2.4.

  **Base Offense Level (U.S.S.G. §2A2.4(a))**      **+10**
  **Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A))**  **+0**

|  |  |
|---|---|
| **Acceptance of Responsibility (U.S.S.G. §3E1.1(a))** | - 0 |
| **Total Adjusted Offense Level** | +10 |

*See* PSR at ¶¶ 39-47

The U.S. Probation Office correctly calculated Hager's criminal history as category I. Hager's criminal history score is zero. *See* PSR ¶ 53. The Sentencing Guidelines Range for Defendant Hager is 6 to 12 months.

### IV. Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors this Court must consider in formulating the sentence. In this case, as described below, the factors weigh in favor of twelve months of incarceration.

#### A. The Nature and Circumstance of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Hager's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Hager, the absence of violent or destructive acts is not a mitigating factor. Had Hager engaged in such conduct he would have faced additional criminal charges.

But here, the clarity of Hager's criminal actions is louder than the alarm heard by Hager as he entered the Capitol. From his own recording device—his cell phone—this Court was able to observe exactly what Hager saw on January 6, 2021. From the bravado of his middle finger on the

11

National Mall, to the recognition of the "shit hittin' the fan," this Court was able to follow alongside Hager on that day. Hager observed officers struggling to hold their line—struggling to keep our elected officials safe. In response, Hager continued to cheer on rioters, denigrate the police officers, and immediately ask "where's Congress" once Hager achieved his goal of entering the Capitol building.

### B. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### C. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Hager wears his crimes from January 6, 2021, as a badge of honor. Hager's online persona is used in a manner to increase the credibility of his preferred narrative, and he continues to spread that narrative at every opportunity. It is a narrative that excuses the rioters' conduct and allows them to evade responsibility for their behavior, and it is a narrative that shows Hager himself presents a risk of recidivism.

Hager remains resolute in trying to justify his own behavior to himself. Hager showed little respect for our nation's norms and procedures on January 6, 2021. He continued to show that same lack of respect leading up to his trial, attempting to convince the internet, that he was the victim in all this. This Court should prevent Hager from further promulgating his false sense of achievement on others for as long as the law will allow.

### D. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[1] This Court must sentence Hager based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

---

[1] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal thatw table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case:

In *United States v Russell Alford*, 21-cr-263-TSC, the defendant was sentenced was to 12 months of incarceration followed by 12 months of supervised released. Much like the present case, in *Alford* the defendant walked past the violence that was occurring in an attempt to get deeper into the Capitol. Much like the present case, in *Alford* the defendant showed no remorse for his actions. Much like the present case, in *Alford* the defendant had a criminal history score of zero. Alford was 62 years old at the time of sentencing; Hager is 59. One distinction between the two is the defendant in *Alford* had an offense level of 12. Here it is 10; however, the range overlaps. The increased offense level followed this Court's finding that Alford lied under oath. But in comparison to Hager, Alford's conduct was tamer than Hager's conduct at the Capitol.

A similar offense level was present in *United States v Moises Romero*, 21-cr-677-TSC. In *Romero,* this Court applied offense level 11 to that felony plea and imposed a 12-month-and-one-day sentence to Romero, who was a 29-year-old nurse who plead guilty to a violation of 18 U.S.C. § 231(c)(3). Much like the present case, in *Romero* the defendant entered the Capitol and recorded his interactions with police. Much like the present case, in *Romero* the defendant had a criminal history score of zero. Unlike the present case, in *Romero* the defendant physically pushed against officers attempting to keep rioters out of the Capitol. But in *Romero* the defendant received an adjustment for acceptance of responsibility. Again, with an offense level of 11 the range overlaps with the range provided by an offense level of 10.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is

"firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

V.     **Restitution**

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence,"

17

§ 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Hager was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[2]

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount

---

[2] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Hager to pay $500 in restitution for his convictions. This amount fairly reflects Hager's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VI. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 12 months of incarceration, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his criminal behavior.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: /s/ *Adam M. Dreher*
ADAM M. DREHER
Assistant United States Attorney
MI Bar No. P79246
601 D. St. N.W.
Washington, D.C. 20530
(202) 252-1706
adam.dreher@usdoj.gov

SAMANTHA R. MILLER
Assistant United States Attorney
New York Bar No. 5342175
United States Attorney's Office
For the District of Columbia
601 D Street, NW 20530
samantha.miller@usdoj.gov